# 25-10372

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

**Jorge Antonio Guerra Quezada**,

Plaintiff-Appellant

v.

**United States of America; Kristi Noem, Secretary, U.S. Department of Homeland Security, in her official capacity; Todd Lyons, Acting Director of Immigration and Customs Enforcement, in his official capacity; John Doe's; Pamela Bondi, U.S. Attorney General, in her official capacity**,

Defendants-Appellees

---

On Appeal from the United States District Court
for the Northern District of Texas, Dallas Division
District Court No. 3:24-CV-564-L

---

## BRIEF FOR APPELLEES

---

Nancy E. Larson
Acting United States Attorney

Brian W. Stoltz
Assistant United States Attorney
Texas State Bar No. 24060668
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone:  214-659-8626
Facsimile:  214-659-8807
brian.stoltz@usdoj.gov

## STATEMENT REGARDING ORAL ARGUMENT

This appeal is from the district court's dismissal of a lawsuit filed by a plaintiff who claimed that he was wrongfully deported (under a removal order issued by an immigration judge). The district court determined that jurisdiction was absent by operation of a jurisdictional bar imposed on such claims by the Immigration and Nationality Act, which instead channels review of removal orders to the courts of appeal in petition-for-review proceedings. Because the record is not complex and the legal issues are relatively straightforward, it is respectfully submitted that this appeal can be decided on the papers without the need for oral argument.

# TABLE OF CONTENTS

Statement Regarding Oral Argument ............................................................. i

Table of Authorities ................................................................................ iv

Statement of Jurisdiction ......................................................................... 1

Statement of the Issue ............................................................................. 1

Statement of the Case............................................................................... 2

    1.   Guerra Quezada is born in Mexico, is later admitted to the
        United States as a lawful permanent resident, and is then
        convicted of felony online solicitation of a minor. ............................ 2

    2.   Guerra Quezada is placed in removal proceedings and concedes
        that he is a citizen of Mexico who is subject to removal. .................... 2

    3.   Guerra Quezada later asserts he might be a U.S. citizen, but that
        claim is rejected in the removal proceedings........................................ 3

    4.   The government erroneously issues a certificate of citizenship to
        Guerra Quezada's father, but then moves to rescind it, and also
        does the same with respect to Guerra Quezada. ................................. 4

    5.   Guerra Quezada files suit in the district court, claiming to have
        been wrongfully removed and seeking $66.24 million in
        damages, and the government moves to dismiss................................. 5

    6.   The magistrate judge concludes that Guerra Quezada's suit is
        barred by the Immigration and Nationality Act and recommends
        dismissal. ........................................................................................ 6

    7.   The district court conducts its own substantive review of Guerra
        Quezada's objections and concludes that dismissal is appropriate. .... 12

Standard of Review.................................................................................. 15

Summary of the Argument ....................................................................... 15

Argument and Authorities ............................................................... 16

  1. The district court did not err in concluding that Guerra Quezada failed to establish jurisdiction for his claims. .................................... 16

  2. Guerra Quezada's arguments in favor of jurisdiction are unavailing. ................................................................................... 21

Conclusion ................................................................................. 34

Certificate of Service .................................................................... 36

Certificate of Compliance ............................................................... 36

Addendum ................................................................. (separately paginated)

## TABLE OF AUTHORITIES

**CASES**

*Afroyim v. Rusk,*
    387 U.S. 253 (1967) ............................................................. 30

*Alexander v. Verizon Wireless Servs., L.L.C.,*
    875 F.3d 243 (5th Cir. 2017) ............................................... 15

*Alvidres-Reyes v. Reno,*
    180 F.3d 199 (5th Cir. 1999) ................................ 12, 17–18, 21

*Arredondo v. Univ. of Tex. Med. Branch at Galveston,*
    950 F.3d 294 (5th Cir. 2020) ............................................... 22

*Cardoso v. Reno,*
    216 F.3d 512 (5th Cir. 2000) ............................................... 18

*Douglass v. United Servs. Auto. Ass'n,*
    79 F.3d 1415 (5th Cir. 1996) (en banc) ..........................15, 23

*Drozd v. I.N.S.,*
    155 F.3d 81 (2d Cir. 1998) ................................................. 26

*Foster v. Townsley,*
    243 F.3d 210 (5th Cir. 2001) ............................................... 12

*Garnica-Vasquez v. Reno,*
    210 F.3d 558 (5th Cir. 2000) ................................................. 2

*Humphries v. Various Fed. USINS Emps.,*
    164 F.3d 936 (5th Cir. 1999) ............................................... 18

*In re S. Recycling, L.L.C.,*
    982 F.3d 374 (5th Cir. 2020) ............................................... 15

*Loper Bright Enters. v. Raimondo,*
    603 U.S. 369 (2024) ...............................................6, 23, 24

*Madar v. U.S. Citizenship & Immigr. Servs.,*
    918 F.3d 120 (3d Cir. 2019) ..........................................25, 26

*Matter of Yanez-Carrillo*,
    10 I. & N. Dec. 366 (1963) ................................................................ 30

*Miresles-Zuniga v. Holder*,
    743 F.3d 110 (5th Cir. 2014) ............................................................. 2

*Moosa v. INS*,
    171 F.3d 994 (5th Cir. 1999) ............................................................. 2

*Off. of Personnel Mgmt. v. Richmond*,
    496 U.S. 414 (1990) ......................................................................... 32

*Rego Valdes v. U.S. Att'y Gen.*,
    133 F. App'x 588 (11th Cir. 2005) .................................................... 26

*Robinson v. TCI/US W. Commc'ns, Inc.*,
    117 F.3d 900 (5th Cir. 1997) ............................................................. 15

*Romero v. Bondi*,
    No. 24-60618, 2025 WL 1379095 (5th Cir. May 13, 2025) ................. 23

*Runnett v. Shultz*,
    901 F.2d 782 (9th Cir. 1990) ............................................................. 26

*Schnell v. State Farm Lloyds*,
    98 F.4th 150 (5th Cir. 2024) ............................................................. 22

*Seville Indus., L.L.C. v. U.S. Small Bus. Admin.*,
    144 F.4th 740 (5th Cir. 2025) ........................................................... 32

*United States v. Rojas*,
    812 F.3d 382 (5th Cir. 2016) ......................................................22–23

*Wallace v. Mississippi*,
    43 F.4th 482 (5th Cir. 2022) ............................................................. 15

*Williamson v. Tucker*,
    645 F.2d 404 (5th Cir. 1981) ............................................................. 31

**STATUTES and RULES**

5th Cir. R. 28.2.2 ................................................................................. 22

8 U.S.C. § 1227(a)(2)(E)(i) .......................................................... 2–3

8 U.S.C. § 1252(a)(5) ................................................................ 4, 17

8 U.S.C. § 1252(g) ................................................ 6, 16, 17, 18, 20, 21

8 U.S.C. § 1401(a)(7) (1970) ............................................... 14, 19, 20

8 U.S.C. § 1401(g) ......................................................7, 8, 10, 11, 26

Fed. R. App. P. 28 ....................................................................... 22

Fed. R. Civ. P. 56(d) ................................................................... 27

Immigration and Nationality Act Amendments of 1986,
    Pub. L. No. 99-653, 100 Stat. 3655 ..................................... 10

Texas Code. Crim. P. art. 42A.101(a) .......................................... 2

Case: 25-10372    Document: 27    Page: 8    Date Filed: 09/19/2025

## STATEMENT OF JURISDICTION

Plaintiff-appellant Jorge Antonio Guerra Quezada filed suit asserting tort and related claims against various government defendants based on allegations that he was wrongfully deported (i.e., removed) from the United States. (ROA.7–31.)  The district court determined that jurisdiction was lacking and entered final judgment on February 14, 2025, (ROA.5, 435, 442), and Guerra Quezada timely filed a notice of appeal on March 5, 2025, (ROA.5, 443).  This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

Guerra Quezada, then a lawful permanent resident of the United States, was placed in removal proceedings due to having been convicted of felony online solicitation of a minor.  After an immigration judge determined that Guerra Quezada was not a citizen of the United States and that grounds for removal were established, Guerra Quezada was ordered removed to Mexico. Rather than further exhausting administrative proceedings and seeking judicial review through a petition-for-review proceeding, Guerra Quezada filed suit in the district court for tort damages and related relief under a theory that he was wrongfully removed.  Did the district court err in concluding that jurisdiction was lacking given the Immigration and Nationality Act's bar on such claims outside of the statutory petition-for-review process?

1

## STATEMENT OF THE CASE

**1.    Guerra Quezada is born in Mexico, is later admitted to the United States as a lawful permanent resident, and is then convicted of felony online solicitation of a minor.**

Guerra Quezada was born in Mexico in 1993.  (ROA.13, 14, 34–35.)

His birth certificate, issued in Mexico, identified his parents as of Mexican

nationality.  (ROA.34–35.)  He was later admitted to the United States as a

lawful permanent resident in 2005.  (ROA.41, 111.)

In 2021, Guerra Quezada was convicted in a state district court of Dallas

County, Texas of the felony offense of online solicitation of a minor, in

violation of Texas Penal Code § 33.021(c).[1]  (ROA.38, 85, 310.)

**2.    Guerra Quezada is placed in removal proceedings and concedes that he is a citizen of Mexico who is subject to removal.**

After Guerra Quezada's conviction, the U.S. Department of Homeland

Security commenced removal proceedings against him under a provision of the

Immigration and Nationality Act that provides for the removal of any alien

convicted of, *inter alia*, certain crimes against children.  (ROA.38); *see also* 8

---

[1] Guerra Quezada's Texas criminal charge was apparently resolved via a deferred adjudication after entry of a guilty plea.  (*See* ROA.85, 111.)  For purposes of federal immigration law, deferred adjudication is considered a conviction.  *See Miresles-Zuniga v. Holder*, 743 F.3d 110, 111 n.1 (5th Cir. 2014); *Garnica-Vasquez v. Reno*, 210 F.3d 558, 560 (5th Cir. 2000); *Moosa v. INS*, 171 F.3d 994, 1005 (5th Cir. 1999).  (Under Texas law, deferred adjudication requires the defendant to enter a plea of guilty or nolo contendere and for the court to hear evidence and make a finding that the evidence "substantiates the defendant's guilt."  *See* Texas Code. Crim. P. art. 42A.101(a).)

U.S.C. § 1227(a)(2)(E)(i).  The charging document in the removal proceedings (the "notice to appear") specifically asserted that Guerra Quezada was a Mexican citizen and not a citizen of the United States.  (ROA.38.)  Guerra Quezada, represented by counsel in the removal proceedings, conceded these allegations and conceded removability.  (ROA.112.)

**3.     Guerra Quezada later asserts he might be a U.S. citizen, but that claim is rejected in the removal proceedings.**

Although Guerra Quezada had admitted his status as a Mexican citizen and his lack of United States citizenship in the immigration court, he later changed tack and filed a motion arguing that he was in fact a citizen.  (*See* ROA.84, 112.)  The immigration judge held a hearing and denied this motion, finding that Guerra Quezada had not shown himself to be a United States citizen.  (*See* ROA.112.)

After further proceedings, the immigration judge rejected certain other arguments (unrelated to the citizenship issue) that Guerra Quezada was making in an attempt to avoid removal, and ordered him removed to Mexico.  (ROA.112–27.)  As part of this same ruling, the immigration judge also rescinded Guerra Quezada's lawful permanent resident status.  (ROA.127.)  The immigration judge's ruling was handed down in September 2021, and Guerra Quezada did not file any administrative appeal with the Board of Immigration Appeals (and therefore he also did not avail himself of the

possibility of judicial review which would have been available after any

decision of the Board, through a petition for review in an appropriate court of

appeals, *see* 8 U.S.C. § 1252(a)(5)).  Guerra Quezada was removed to Mexico

shortly thereafter.  (*See* ROA.215.)

**4.      The government erroneously issues a certificate of citizenship to Guerra Quezada's father, but then moves to rescind it, and also does the same with respect to Guerra Quezada.**

Meanwhile, for reasons that are not entirely clear from the record, U.S.

Citizenship and Immigration Services (USCIS) erroneously issued a certificate

of citizenship to Guerra Quezada's father in November 2021.  (*See* ROA.16–

17, 82, 278–79.)  Shortly thereafter, though, in December 2021, USCIS

initiated proceedings to cancel the certificate, as is permissible when a

certificate is issued in error or without the benefit of material information

showing ineligibility.  (ROA.169–71.)  The certificate was thereafter cancelled,

and a similar certificate that was also erroneously issued to Guerra Quezada

himself, apparently as derivative of the father's certificate (*see* ROA.279), was

later likewise made the subject of administrative cancellation proceedings that

remain pending at this time.[2]

---

[2] The cancellation of Guerra Quezada's father's certificate does not appear in the record of this case, but information about this occurrence is available on the public docket of litigation filed by the father.  *See Guerra Vazquez v. Jaddou*, No. 3:24-CV-2212-K (N.D. Tex.) (suit challenging the cancellation decision).  The undersigned has also been informed by USCIS

**5.    Guerra Quezada files suit in the district court, claiming to have been wrongfully removed and seeking $66.24 million in damages, and the government moves to dismiss.**

Claiming to have sustained damages in the amount of $66.24 million for his allegedly wrongful removal, Guerra Quezada presented an administrative tort claim to the government and followed up with a lawsuit filed in the district court. (ROA.7, 218, 221.)  Relying on the Federal Tort Claims Act, Guerra Quezada brought claims for negligence, gross negligence, false arrest, wrongful imprisonment, intentional infliction of emotional distress, and malicious abuse of process, as well as claims for due process violations and related declaratory relief. (ROA.20–30.)  The core premise of Guerra Quezada's complaint was that he had been "wrongfully deported." (ROA.7.)

The government appeared in the case and filed a motion to dismiss. (ROA.268.)  As relevant to the district court's eventual decision, the government argued that Guerra Quezada's suit was barred by a section of the Immigration and Nationality Act, codified at 8 U.S.C. § 1252, that establishes the petition-for-review process to allow for judicial review of removal orders but otherwise specifies, at § 1252(g), that "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision

---

that the administrative cancellation of Guerra Quezada's citizenship certificate remains pending.

or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien." (ROA.281 (quoting 8 U.S.C. § 1252(g)).) Because Guerra Quezada's claims arose out of his removal from the United States as ordered by the immigration judge, jurisdiction was unavailable, the government asserted. (ROA.281–83.)

In his response to the motion to dismiss, Guerra Quezada did not dispute that his claims arose out of the allegedly wrongful removal, but instead argued that § 1252(g) did not apply because, by its own terms, the statute only bars claims brought outside the petition-for-review process "by or on behalf of any alien." (*See* ROA.314.) Guerra Quezada asserted that he was a United States citizen, not an alien, and thus that § 1252(g) did not apply to his case. (ROA.314–16.) Specifically, Guerra Quezada argued that he had acquired United States citizenship through his father (as discussed in more detail below). (ROA.311, 315–16.)

### 6. The magistrate judge concludes that Guerra Quezada's suit is barred by the Immigration and Nationality Act and recommends dismissal.

After the completion of briefing on the motion to dismiss (including supplemental briefing to address the impact, if any, of the Supreme Court's intervening decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) (*see* ROA.4–5, 383, 391)), the magistrate judge issued a Findings, Conclusions, and Recommendation (FCR) recommending that the district court dismiss the

case for lack of jurisdiction.  (ROA.400.)  Taking note of the parties' dispute
about the potential applicability of § 1252(g), the FCR explained that a "two-
part" analysis was necessary to ascertain whether jurisdiction existed, by
considering "(1) whether [Guerra Quezada] is an alien; and (2) if so, whether
all of [Guerra Quezada's] claims arise from the actions of the Attorney
General seeking the removal of [Guerra Quezada] from the United States."
(ROA.405.)

     On the first issue, Guerra Quezada's citizenship, the FCR reviewed the
record—which included various exhibits submitted by Guerra Quezada
consisting of items like birth and marriage certificates and family-history
affidavits supplied by his grandfather and father—and determined that Guerra
Quezada was not a United States citizen.  (ROA.405–09 (FCR's analysis); *see
also* ROA.34–221 (materials submitted by Guerra Quezada).)

     In this regard, Guerra Quezada was undisputedly born outside the
United States, but was claiming citizenship via his father, who was asserted to
be a United States citizen.  (*See* ROA.14.)  Accordingly, the FCR looked to the
relevant statute, at 8 U.S.C. § 1401, that governs whether "'a person born
outside the geographical limits of the United States' acquired U.S. citizenship
at birth."  (ROA.406 (quoting 8 U.S.C. § 1401(g)).)  At the time of Guerra
Quezada's birth, that statute required at least one parent to be a United States

citizen and further required that same parent to have previously been physically present in the United States for at least five years prior to the child's birth (with at least two of those years occurring after age 14) in order for citizenship to be transmitted to the child.  (*See* ROA.406 (citing 8 U.S.C. § 1401(g)).)  The same statute had existed for many prior decades (at times in slightly altered form[3]), during which time it would have governed the alleged citizenship of any other family members of Guerra Quezada's born outside the United States.  For this reason, the determination of Guerra Quezada's citizenship required an "examination of his lineage and the family members through which he claims he acquired citizenship," the FCR explained.  (ROA.406.)

Because, as noted above, Guerra Quezada was claiming citizenship through his father, the FCR began its analysis with a paternal great-grandmother of Guerra Quezada's.  (ROA.405–06.)  This great-grandmother, the FCR explained, was a United States citizen at birth because she was born in Kansas in 1924.  (ROA.407.)

Next, the FCR considered the circumstances of the birth of the great-

---

[3] The Addendum to this brief contains materials showing what version of the statute was in effect at different relevant times (corresponding primarily to the 1972 birth of Guerra Quezada's father and also Guerra Quezada's own birth in 1993) and how the statute was amended during that time.

grandmother's son (Guerra Quezada's grandfather), to see if he was born a United States citizen even though he was born in Mexico. (ROA.407–08.) Under the relevant law at the time, Guerra Quezada's grandfather would have been born a United States citizen, notwithstanding his birth in Mexico, if his Kansas-born mother had been continuously present in the United States for at least one year prior to his birth. (ROA.407–08.) The FCR found the record seemingly lacking in any proof that this continuous-presence requirement was satisfied. (ROA.408.) Nonetheless, the FCR assumed for the sake of argument that the great-grandmother had been present in the United States for at least one year so as to transmit United States citizenship to her son (the grandfather) at the time of his birth. (ROA.408.) The FCR therefore proceeded to consider whether the grandfather's son (Guerra Quezada's father) had been born a United States citizen, such that he could have later transferred such citizenship to Guerra Quezada. (ROA.408.)

At this link in the chain, the FCR found that even if Guerra Quezada's grandfather were assumed to have been a United States citizen from birth, such citizenship was not transferred to his son (Guerra Quezada's father). (ROA.408–09.) The FCR explained that the grandfather would have needed to have been physically present in the United States for at least five years prior to the time of his son's birth in order for that Mexican-born son (i.e., Guerra

Quezada's father) to receive United States citizenship.[4]  (ROA.408–09 (citing 8

U.S.C. § 1401(g)).)  But in an affidavit signed by the grandfather and submitted

to the district court by Guerra Quezada himself, the grandfather stated that he

had only left Mexico to live in the United States (in California) in the "early

1970s," with his son (Guerra Quezada's father) then born in 1972 in Mexico.

(ROA.409 (citing ROA.42 (the grandfather's affidavit)); *see also* ROA.14 (date

of birth of the father in 1972).)

    In other words, the grandfather at most had only two years of physical

presence in the United States at the time his son (Guerra Quezada's father)

was born in Mexico in 1972—well short of the five-year period (actually a ten-

year period, as explained in footnote 4 below) required by statute.  (ROA.409.)

Therefore, no United States citizenship was transmitted to Guerra Quezada's

father at the time of his birth, even if the grandfather were assumed to have

---

[4] Under the version of 8 U.S.C. § 1401 in effect at the time of Guerra Vasquez's father's birth (in 1972), the relevant time period for the physical-presence requirement was actually ten years (with at least five years after age 14), not the five-year period that the FCR apparently had in mind (and that was in effect at later times, including at the time of Guerra Quezada's own birth).  The version of § 1401 in effect in 1972 can be seen in the excerpts from the 1970 and 1976 editions of the U.S. Code contained in the Addendum to this brief—§ 1401 was unchanged during that period.  The statute was later amended in 1986 to shorten the ten-year period (with at least five years after age 14) that had previously been in effect to a five-year period (with at least two years after age 14).  *See* Immigration and Nationality Act Amendments of 1986, Pub. L. No. 99-653, § 12, 100 Stat. 3655, 3657 (which is also contained in the Addendum).  Because Guerra Quezada's father would not have received citizenship even under the terms of the (more favorable) later statute, this distinction is ultimately immaterial and Guerra Quezada does not argue that any confusion about which version of § 1401 was in effect at any given time constitutes reversible error.

been a United States citizen.  (ROA.409.)  And, given Guerra Quezada's

father's status as an alien, there was no basis for Guerra Quezada to have

obtained United States citizenship from his father under 8 U.S.C. § 1401(g),

because the statute required at least one parent to be a United States citizen.[5]

(ROA.409); *see also* 8 U.S.C. § 1401(g).

Last, having ascertained that Guerra Quezada was not a United States

citizen, the FCR considered whether § 1252(g) applied to bar jurisdiction.

(ROA.409–11.)  Explaining that Guerra Quezada's "substantive claims"—i.e.,

his tort claims—"directly arise 'from the decision or action by the Attorney

General to commence proceedings, adjudicate cases, or execute removal

orders against' him," the FCR concluded that § 1252(g) applied to those claims

as well as to his other non-tort claims that were "not standalone claims, but

seek relief contingent upon the assertion of a valid substantive cause of action."

(ROA.410.)  The FCR noted that "federal courts, including those within the

Fifth Circuit, have routinely dismissed claims asserted under the FTCA and

alleging constitutional violations, as well as actions seeking mandamus,

injunctive, and declaratory relief, for lack of subject matter jurisdiction

pursuant to § 1252(g) where, as here, such claims arise from a decision to

---

[5] Guerra Quezada has not asserted that his mother was a United States citizen.  Therefore,
the only relevant question is whether his father was.

commence removal proceedings or execute a removal order." (ROA.409–10

(collecting cases, including *Foster v. Townsley*, 243 F.3d 210, 214 (5th Cir. 2001)

(denying due process claim under § 1252(g) because it arose from INS officer's

decision to execute a deportation order), and *Alvidres-Reyes v. Reno*, 180 F.3d

199, 201, 206 (5th Cir. 1999) (dismissing for lack of subject matter jurisdiction

under § 1252(g) plaintiffs' claims seeking mandamus, declaratory, and

injunctive relief connected to the Attorney General's deportation-related

decisions)).)

On the basis of the foregoing, the FCR recommended that the district

court grant the government's motion to dismiss. (ROA.411.)

## 7. The district court conducts its own substantive review of Guerra Quezada's objections and concludes that dismissal is appropriate.

Guerra Quezada objected to the FCR and reiterated his claim to having

obtained United States citizenship from his father (and tracing back to his

Kansas-born great-grandmother). (*See* ROA.413.) In a seven-page order, the

district court conducted a *de novo* review of the portions of the FCR that had

been objected to, overruled these objections, and accepted the FCR's findings

and conclusions[6] about Guerra Quezada's lack of United States citizenship.

---

[6] Since the magistrate judge's FCR was accepted by the district court, this brief will hereafter simply refer to the underlying decision (including the FCR) as the decision of the district court, without distinguishing between the FCR and the district court's order unless specifically relevant.

(ROA.435–41.)

The district court explained that Guerra Quezada was "not disputing that the applicable law for determining his citizenship is the statute in effect at the time he was born," and therefore the district court looked to the statute applicable to foreign-born persons that was cited in the FCR:  8 U.S.C. § 1401. (ROA.439.)  This statute, as previously discussed, has in its various iterations generally required a showing that the person was born to at least one United States citizen *and* that this parent satisfied a physical-presence-in-the-United-States requirement in order for the parent's citizenship to be transmitted to a child.  (ROA.439–40; *see also* p. 10, n. 4, *supra*.)  Whether Guerra Quezada had been born to at least one United States citizen as required by the statute turned on whether Guerra Quezada's father was a citizen.  (ROA.440.)  And on this question, the district court explained that it was necessary to consider whether Guerra Quezada's grandfather (whom the FCR assumed was a United States citizen) satisfied the physical-presence requirement at the time of Guerra Quezada's father's birth in 1972 so as to transmit United States citizenship to the father.  (ROA.440.)

The district court noted that Guerra Quezada "provides an affidavit from his grandfather," in which the "grandfather states that he moved to California sometime in the early 1970s and stayed there until his father's death in 1975."

(ROA.440.) It was therefore the case that the grandfather, even if assumed to have been a United States citizen, "could not have been present in the United States for at least five years before [Guerra Quezada's] father was born, as required by Section 1401(g)" to transmit citizenship to the father.[7] (ROA.440.) The father was born in 1972, in Mexico, and Guerra Quezada's grandfather had at that time only been living in the United States for, at most, a couple years (after having arrived in the "early 1970's," as he explained in his affidavit). (*See* ROA.44.) Because the physical-presence requirement was not satisfied by the grandfather as of the time of the father's birth in 1972 under the facts established by Guerra Quezada's own evidence, the district court determined that Guerra Quezada's father "did not obtain United States citizenship at birth," and that Guerra Quezada therefore likewise "did not obtain citizenship at birth and is not a United States citizen." (ROA.440.)

The district court dismissed the case for lack of jurisdiction, and this appeal has followed.

---

[7] Again, although the district court referred to § 1401(g) and its five-year physical-presence requirement when discussing whether Guerra Quezada's father received United States citizenship at the time of his birth in 1972, the version of the statute in effect at the time actually had a ten-year physical-presence requirement. *See* 8 U.S.C. § 1401(a)(7) (1970). Nonetheless, Guerra Quezada does not claim that any confusion about which version of the statute was in effect in 1972 was error or affected his rights, and given that his grandfather did not satisfy even the five-year physical-presence requirement under the more recent version of the statute, it is clear that he also did not satisfy the ten-year requirement that actually was in effect at the time.

## STANDARD OF REVIEW

This Court generally reviews a district court's dismissal for lack of jurisdiction *de novo*. *See In re S. Recycling, L.L.C.*, 982 F.3d 374, 379 (5th Cir. 2020). However, when, as occurred here, the party against whom judgment was rendered was warned about the need to object to the magistrate judge's FCR, only the objected-to portions of the FCR that the district court reviewed *de novo* should receive *de novo* review in this Court; otherwise, issues that were not objected to and that did not receive *de novo* review by the district court are reviewed in this Court only for plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc); *Wallace v. Mississippi*, 43 F.4th 482, 494–95 (5th Cir. 2022); *Alexander v. Verizon Wireless Servs., L.L.C.*, 875 F.3d 243, 248 (5th Cir. 2017). And similarly, to the extent a district court's ruling depends on the resolution of disputed jurisdictional facts, those findings are reviewed for clear error. *See Robinson v. TCI/US W. Commc'ns, Inc.*, 117 F.3d 900, 904 (5th Cir. 1997).

## SUMMARY OF THE ARGUMENT

The district court properly concluded that 8 U.S.C. § 1252(g) prohibited Guerra Quezada from establishing jurisdiction for his claims. Guerra Quezada filed suit under a theory that he had been wrongfully deported. But this deportation (i.e., removal) occurred pursuant to the order of an immigration

judge issued in removal proceedings after Guerra Quezada was convicted of felony online solicitation of a minor in Texas state court, and § 1252(g) provides that the district courts lack jurisdiction "to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien."  Under a straightforward application of § 1252(g), Guerra Quezada's claims were not jurisdictionally proper in the district court.

Guerra Quezada's principal argument against the application of § 1252(g) is that he is not, in fact, an alien, and instead that he received United States citizenship through his father.  But the district court correctly found otherwise, because the record evidence established that Guerra Quezada's grandfather, even if assumed to have been a United States citizen, had not transmitted such citizenship to Guerra Quezada's father at the time of the father's birth in Mexico.  Thus, Guerra Quezada could not have obtained any United States citizenship from his father.  Guerra fails to show any error in this jurisdictional ruling of the district court, nor do his other arguments entitle him to any relief.  Accordingly, the district court's judgment should be affirmed.

## ARGUMENT AND AUTHORITIES

**1.**     **The district court did not err in concluding that Guerra Quezada failed to establish jurisdiction for his claims.**

Guerra Quezada's complaint in the district court alleged that he was

harmed as a result of his removal to Mexico at the order of an immigration judge, and sought tort damages and related relief.  (ROA.7–30; *see also* ROA.213 (Guerra Quezada's underlying administrative tort claim, which contended that the immigration judge had "wrongfully issued a removal order against" him).)  But the Immigration and Nationality Act establishes an exclusive procedure by which judicial review of removal orders may be obtained, which is through a petition for review filed in an appropriate court of appeals.  8 U.S.C. § 1252(a)(5).  And the flip side to this statutorily authorized judicial review option is that the Immigration and Nationality Act bars jurisdiction in the district courts for claims arising out of executed removal orders.  Specifically, under 8 U.S.C. § 1252(g), "[e]xcept as provided in this section [e.g., under the petition-for-review process] and notwithstanding any other provision of law (statutory or nonstatutory) . . . no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter."

As this Court has explained, § 1252(g) "applies without limitation to claims arising from all past, pending, or future exclusion, deportation, or removal proceedings."  *Alvidres-Reyes v. Reno*, 180 F.3d 199, 201, 206 (5th Cir.

1999) (internal quotation marks and citation omitted); *see also Cardoso v. Reno*, 216 F.3d 512, 514, 516–17 (5th Cir. 2000) (finding that § 1252(g) barred judicial review where a plaintiff who had been ordered removed sought declaratory and injunctive relief to allow her to adjust immigration status and remain in the United States).  And the term "arising from" within the statute extends, at a minimum, to claims "connected directly and immediately with" any "'decision or action . . . to commence proceedings, adjudicate cases, or execute removal orders.'" *Humphries v. Various Fed. USINS Emps.*, 164 F.3d 936, 943 (5th Cir. 1999) (quoting 8 U.S.C. § 1252(g)).

Here, the district court correctly concluded that § 1252(g) prohibited Guerra Quezada from establishing jurisdiction for his claims.  (*See* ROA.405–11, 435–41.)  As the district court noted (and consistent with Guerra Quezada's own framing of the issue), the primary contested issue was whether § 1252(g) applied at all, given that the statutory text limits the jurisdictional bar to claims "by or on behalf of any alien."  (*See* ROA.405, 439; *see also* ROA.314 (Guerra Quezada's explanation that "the most important question at the heart of this case is whether Mr. Guerra is likely a United States citizen").)  Thus, the jurisdictional issue essentially devolved to the question of whether Guerra Quezada was an alien or a United States citizen.

On this question, the district court painstakingly recounted the relevant

18

facts and evidence relating to Guerra Quezada's lineage. (ROA.406–09, 440.) It was undisputed that Guerra Quezada's great-grandmother was born in Kansas, but also that each of Guerra Quezada's more recent family members in the great-grandmother's line—the grandfather and father—were born in Mexico. (*See* ROA.14, 407–08.) Thus, focusing on Guerra Quezada's father specifically, the relevant question relating to the father's citizenship status (and ultimately to Guerra Quezada's) was whether the grandfather was both a United States citizen *and* met the relevant physical-presence-in-the-United-States requirement at the time of the father's birth in 1972. *See* 8 U.S.C. § 1401(a)(7) (1970). If Guerra Quezada's father was not a United States citizen because the grandfather did not meet the physical-presence requirement, then Guerra Quezada could not have received United States citizenship through his father.

The district court assumed for the sake of argument that the grandfather was a United States citizen, but concluded that the statutory physical-presence requirement was not met so as to allow transmission of that citizenship to Guerra Quezada's father. (ROA.408–09.) According to the grandfather's own affidavit, he had only been in the United States for, at most, two years at the time his son (Guerra Quezada's father) was born in Mexico. (ROA.44, 409, 440.) The grandfather "went to live with [his] uncles in the United States" in

the "early 1970's," (ROA.44), and the father was then born in 1972, (ROA.14). The grandfather therefore had, at most, two years of physical presence in the United States at the time of Guerra Quezada's father's birth. (*See* ROA.409.) Under the relevant statute, though, ten years of such physical presence were required to allow transmission of citizenship. *See* 8 U.S.C. § 1401(a)(7) (1970).

With the physical-presence requirement not satisfied at the time of Guerra Quezada's father's birth in 1972, the father was not a United States citizen. It therefore followed, under 8 U.S.C. § 1401(g), that at the time of Guerra Quezada's birth in 1993, Guerra Quezada likewise was not a United States citizen, because his claim of citizenship was derivative of his father's alleged citizenship. (Nor, given his father's status as an alien, could Guerra Quezada have somehow received citizenship from his father at some later time.) Accordingly, the district court was on firm ground in concluding that Guerra Quezada was not a United States citizen.

Finally, with Guerra Quezada's status as an alien established, the only remaining question was whether his claims fell within the ambit of 8 U.S.C. § 1252(g)'s bar on "any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter." Given the nature of Guerra Quezada's complaint, which forthrightly

20

summarized in its very first paragraph that the case concerned what Guerra Quezada characterized as an occurrence of being "wrongfully deported" from the country, the § 1252(g) bar did apply. (*See* ROA.7.)

As the district court explained, Guerra Quezada's "substantive claims 'directly arise 'from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against' him,'" and his "non-FTCA claims for mandamus, injunctive, and declaratory relief are not stand-alone claims, but seek relief contingent upon the assertion of a valid substantive cause of action." (ROA.437 (quoting the FCR and 8 U.S.C. § 1252(g)).) Accordingly, Guerra Quezada's claims were held to fall within the ambit of § 1252(g) so as to bar their litigation in the district court. This conclusion was correct and is consistent with relevant precedent. *See Alvidres-Reyes*, 180 F.3d at 204 n.4 (explaining that § 1252(g) "applies without limitation to claims arising from all past, pending, or future exclusion, deportation, or removal proceedings" (internal quotation marks and citation omitted)). And indeed, Guerra Quezada has not argued otherwise.

## 2.  Guerra Quezada's arguments in favor of jurisdiction are unavailing.

Guerra Quezada does offer a number of other arguments as grounds for reversing the district court. At the outset, though, Guerra Quezada's brief fails to comply with the Federal Rules of Appellate Procedure and the local rules of

this Court because he offers no citations to the record for any of the factual assertions in his brief. Rule 28(a) of the Federal Rules of Appellate Procedure provides that the appellant's brief must contain "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies." Fed. R. App. P. 28(a)(8)(A). In addition, this Court's local rules require that "[e]very assertion in briefs regarding matter in the record must be supported by a reference to the page number of the original record . . . where the matter is found using the record citation form as directed by the Clerk of Court." 5th Cir. R. 28.2.2.

"Failure to adhere to these rules usually results in dismissal of the appeal," *Arredondo v. Univ. of Tex. Med. Branch at Galveston*, 950 F.3d 294, 298 (5th Cir. 2020), or forfeiture of the appellant's arguments, *Schnell v. State Farm Lloyds*, 98 F.4th 150, 161 (5th Cir. 2024). Guerra Quezada has not provided *any* record citations in his brief. Accordingly, he has forfeited any challenge to the district court's judgment. *See Schnell*, 98 F.4th at 161 ("A party may forfeit an argument through inadequate briefing in several ways, such as . . . by failing to offer record citations" (internal quotation marks and citation omitted)); *Arredondo*, 950 F.3d at 298–99 (declining to excuse an appellant's failure to provide record citations, and explaining that record citations "help us parse out the issues that are actually before us on appeal"); *United States v. Rojas*, 812

F.3d 382, 407 n.15 (5th Cir. 2016) ("Moya also asserts that the district court 'refused' to compel the testimony of Freddy Correa and did not authorize funding for expert witnesses. Moya, however, does not include record citations in support of these arguments. He has failed to adequately brief these arguments."); *see also Romero v. Bondi*, No. 24-60618, 2025 WL 1379095, at *1 (5th Cir. May 13, 2025) (explaining that the petitioners "forfeited their challenges to" an underlying agency decision in a petition-for-review proceeding, where their "counseled brief" contained only two citations to the record).

Moreover, even if the deficiencies of Guerra Quezada's brief could be overlooked, none of his arguments succeeds on the merits:

*Loper Bright* does not apply. The first issue identified in Guerra Quezada's brief is based on the Supreme Court's recent decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024). (*See* Br. at 3, 21–23.) But *Loper Bright* was nowhere mentioned in Guerra Quezada's objections to the FCR, (*see* ROA.413–17), and thus this argument would at most be reviewed for plain error. *See Douglass*, 79 F.3d at 1428–29. In any event, Guerra Quezada fails to show any *Loper Bright*-related error by the district court, much less plain error.

The decision in *Loper Bright* interpreted the Administrative Procedure Act and overruled the practice of giving *Chevron* deference to agency

interpretations of ambiguous statutes that the agencies administer.  *See Loper Bright*, 603 U.S. at 377–79, 412–13.  Thus, *Loper Bright* addressed a completely different statutory scheme than that at issue here under the Immigration and Nationality Act.  Moreover, even if *Loper Bright* were to somehow apply beyond the APA, its focus is on how courts should defer (or not defer) to agency interpretations of ambiguous statutes.  *See id.* at 413 (holding that "courts need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous").  In this case, in contrast, there is no argument that some relevant statutory text was somehow ambiguous and required interpretation by the agency in a case-dispositive way.  Instead, the case turned on an application of unambiguous statutory language to the facts of Guerra Quezada's alleged citizenship and his family lineage.  *Loper Bright* is inapplicable, and additionally, Guerra Quezada's related contention that the district court somehow failed to conduct a *de novo* review of his objections to the FCR is also meritless.  (*See* Br. at 21.)  The district court expressly explained that it "conducted a *de novo* review of the portions of the [FCR] to which objections were made," (ROA.441), and issued a seven-page order that substantively discussed the objections and provided the district court's own explanation for rejecting them, (ROA.435–41).

<u>The concept of "constructive physical presence" does not support</u> <u>Guerra Quezada's arguments</u>.  Guerra Quezada also argues, in opposition to both the district court's analysis and its ultimate conclusion that he was not a United States citizen, that the district court failed to consider whether his great-grandmother or other family members should have been considered to have "constructive physical presence" in the United States after the great-grandmother apparently left her birthplace in Kansas and began living in Mexico.[8]  (Br. at 13–16.)

But an initial—and fundamental—flaw in this argument is that the concept of "constructive physical presence" has no bearing on the analysis of whether United States citizenship has been transmitted from a United States citizen to the citizen's child born outside the country (as opposed to evaluating whether citizenship has been retained or instead relinquished by a person due to the person's own lack of physical presence in the United States).  The courts of appeals that have considered this issue "have uniformly rejected extending the constructive physical presence doctrine to transmission of citizenship." *Madar v. U.S. Citizenship & Immigr. Servs.*, 918 F.3d 120, 123 (3d Cir. 2019); *see*

---

[8] The "constructive physical presence" issue was included within Guerra Quezada's objections to the FCR.  (*See* ROA.419–22.)  However, as discussed herein, it is irrelevant and supplies no basis for relief.

*also Drozd v. I.N.S.*, 155 F.3d 81, 87 (2d Cir. 1998) (collecting cases).  This is so

for two main reasons.  First, the applicable statute sets forth only two

exceptions to the physical-presence requirement, neither of which applies here.

*See* 8 U.S.C. § 1401(g) (exceptions for periods of time spent abroad in

connection with service in the Armed Forces of the United States or

employment with the United States Government); *see also Madar*, 918 F.3d at

122–23 (discussing these exceptions and their history in the statute); *Rego*

*Valdes v. U.S. Att'y Gen.*, 133 F. App'x 588, 589–90 (11th Cir. 2005) (explaining

that the plain meaning of the statute precludes the use of "constructive physical

presence" for reasons outside the exceptions listed in the statute).  Second, the

"concern" that has "led to the application of constructive residence in order to

preserve an individual's retention of citizenship" is that "courts have

traditionally hesitated to find that Congress could take away citizenship

without the citizen's consent."  *Runnett v. Shultz*, 901 F.2d 782, 784 (9th Cir.

1990).  But that same concern is not present in transmission cases, where

"citizenship is simply not being conferred," rather than being taken away.  *Id.*;

*see also Madar*, 918 F.3d at 123 ("In declining to extend the constructive

physical presence doctrine, courts have noted that retention cases and

transmission cases involve different interests.").

　　Moreover, even if it were somehow legally germane, the question of

26

Guerra Quezada's great-grandmother's physical presence in the United States would only be relevant to the question whether her own son (Guerra Quezada's grandfather) obtained United States citizenship at birth. But the district court *assumed* that the grandfather was a United States citizen for purposes of its analysis of Guerra Quezada's citizenship. (ROA.408–09, 440.) Thus, the great-grandmother was effectively credited with whatever period of physical presence was required under the statute at the relevant time, and a resort to consideration of "constructive physical presence" would not have been necessary. (*See* ROA.440 (explaining that the "great-grandmother and grandfather's citizenship is not in dispute").)

The facts about the grandfather's physical presence in the United States are undisputed. Next, relating to the issue of whether Guerra Quezada's father acquired United States citizenship at birth through the grandfather, Guerra Quezada argues that additional "factual development" is required to evaluate whether the grandfather met the physical-presence requirement at the time of the father's birth. (Br. at 15.)

But there are two problems with this argument. First, Guerra Quezada did not argue in his objections to the FCR (or at any other time before the district court) that additional factual development (presumably meaning discovery) was necessary. (*See* ROA.413–27.) And on appeal, he cannot show

any plain error in connection with the alleged failure to allow such factual development. He also does not explain what additional factual development is necessary, specifically, or why it was not within his ability to present any additional allegedly relevant information to the district court in a timely manner. *Cf.* Fed. R. Civ. P. 56(d) (explaining that a nonmovant against whom summary judgment is sought must "show[] by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition" in order to receive additional time for discovery or to obtain more evidence).

Guerra Quezada in fact submitted numerous documents relevant to his family history and lineage, including family-history affidavits from his grandfather and father. (ROA.34–221.) He had ample opportunity, and took advantage of that opportunity, to marshal whatever evidence he desired to place in front of the district court. The problem was not a lack of opportunity to engage in factual development, but rather that the very facts that Guerra Quezada did develop and provide to the district court—particularly in the form of his grandfather's own affidavit—were ultimately fatal to his case, because they established that the physical-presence requirement had not been met by the grandfather as would have been necessary to transmit United States citizenship to Guerra Quezada's father at the time of his birth in 1972. (*See* ROA.408–09, 440.)

28

Second, as the above explanation highlights, the record belies the need for any additional factual development. The district court's decision turned on whether Guerra Quezada's grandfather transmitted United States citizenship to the father. And as already noted, Guerra Quezada supplied an affidavit from the grandfather himself, in which the grandfather explained when he was physically present in the United States (starting in the "early 1970's" and until 1975) in a manner that established that the physical-presence requirement had not been satisfied at the time of Guerra Quezada's father's birth in 1972. (*See* ROA.44.) No additional information is needed, and Guerra Quezada does not explain what further factual development could possibly be required given that the grandfather himself has directly explained when he was physically present in the United States and for how long.

Moreover, as already discussed above, to the extent Guerra Quezada may be suggesting that additional factual development is needed on the issue of whether the grandfather or any other family member could have had a "constructive physical presence" in the United States, that is irrelevant to the legal issue relating to the possible transmission of citizenship from the grandfather to the father. Tellingly in this regard, Guerra Quezada relies on administrative and court decisions relating to the retention or relinquishment of citizenship, not the transmission of citizenship. (*See* Br. at 16 & n.2 (citing

29

*Matter of Yanez-Carrillo*,[9] 10 I. & N. Dec. 366 (1963) (considering the effect of statutory retention provisions on persons who were unaware of their United States citizenship), and *Afroyim v. Rusk*, 387 U.S. 253 (1967) (considering whether a person had lost his United States citizenship by voting in another country's political election).)  Further, the district court did not find that the grandfather had United States citizenship but had relinquished or waived it at the time of the father's birth.  Instead, the grandfather was assumed to have been a United States citizen at that time, and the district court then went on to consider the entirely separate issue of whether the physical-presence requirement was satisfied by the grandfather.  (*See* ROA.408–09, 440.)  Because it was not, Guerra Quezada's father did not acquire United States citizenship and therefore could not have transmitted such citizenship to Guerra Quezada.

No jurisdictional prove-up was necessary.  Guerra Quezada also faults the district court for not holding a "jurisdictional prove-up." (Br. at 18.)  Initially, though, it is not clear that Guerra Quezada actually preserved this argument in his objections to the FCR, which as relevant to a "prove-up" or

---

[9] Guerra Quezada's citation to the *Yanez-Carillo* decision gives a Westlaw citation of "2017 WL 8787182, at *2." (Br. at 16 n.2.)  But 2017 WL 8787182 does not appear to be a valid Westlaw citation.  The undersigned assumes that the intended reference was the 1963 *Yanez-Carillo* decision of the Board of Immigration Appeals, which can be found at 10 I. & N. Dec. 366 or through the Westlaw citation of 1963 WL 12332.

hearing included only a cursory statement that the FCR's "failure to consider these prior filings"—referring to filings relating to the "constructive physical presence" argument—"further weakens the basis for dismissal, especially at this early stage of the litigation before the parties have even had an opportunity to participate in an evidentiary hearing before the Court." (ROA.422.) This passing statement, in the context of an entirely separate argument, was not actually a request for a hearing, nor was it an argument that the FCR was somehow rendered erroneous by the absence of a hearing.

In any event, no error, plain or otherwise, is shown. A district court "has the power to dismiss for lack of subject matter jurisdiction on any one of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981). Here, the relevant jurisdictional facts related primarily to the circumstances of Guerra Quezada's father's birth and the duration of the grandfather's physical presence in the United States prior to that birth. And these facts were established by Guerra Quezada's own documentary submissions, including the grandfather's affidavit. (*See* ROA.44.) No evidentiary hearing was necessary, especially given that the issues relating to "constructive physical presence" that Guerra Quezada suggests would have

been explored at a hearing (*see* Br. at 18–19) are irrelevant to the issue of the transmission of citizenship (as previously discussed above).  No hearing, or related discovery, was required.

Estoppel, due process, and similar considerations do not support any relief.  Guerra Quezada's brief also offers assorted arguments based on theories of estoppel and alleged inconsistent treatment of family members, (Br. at 23–26, 31–33), along with arguments under a due process rubric and that make a claim of a "broader pattern of agency misconduct in citizenship determinations," (Br. at 33).  But none of these arguments has merit.

For one, estoppel generally does not run against the government, and even if it theoretically could be available in certain (unspecified) situations, it "'cannot be entertained where public money is at stake.'"  *Seville Indus., L.L.C. v. U.S. Small Bus. Admin.*, 144 F.4th 740, 750 (5th Cir. 2025) (quoting *Off. of Personnel Mgmt. v. Richmond*, 496 U.S. 414, 427 (1990)).  That is the case here, given that Guerra Quezada is seeking millions of dollars in damages under the Federal Tort Claims Act.  (*See* ROA.30, 221.)  Additionally, the timing of the alleged grounds for estoppel (USCIS's erroneous issuance of citizenship certificates to Guerra Quezada's father and then to Guerra Quezada himself) does not support any estoppel claim.  Guerra Quezada had already been both ordered removed and in fact physically removed to Mexico (in or around

September 2021) before USCIS issued the first of the erroneous certificates (on December 2, 2021). (ROA.8, 16, 154.) Thus, in no sense can Guerra Quezada be said to have relied to his determent on any certificate in connection with his removal proceedings. The allegedly improper removal had already occurred.

Any claim of unequal treatment of family members also fails. Guerra Quezada cites no authority showing that this theory can support the kind of relief he was seeking in the district court (or is seeking on appeal). And factually, the claim of unequal treatment is not substantiated—for example, USCIS has taken action to cancel the erroneously issued certificates with respect to both Guerra Quezada and his father, so no unequal treatment is shown there. Guerra Quezada also cannot show that any alleged recipients of "better" treatment are similarly situated to him. His removal turned on the specific facts of his own citizenship and whether his father had been born a citizen in 1972. Other family members had different specific facts of their own. (*See* ROA.14 (noting that other family members were born in the United States).)

Finally, Guerra Quezada's arguments about due process and alleged agency misconduct in connection with scattered instances of supposed improper removals of other unrelated persons fail to show any entitlement to relief. (Br. at 27–29, 33–36.) Guerra Quezada also claims that he was

somehow "foreclosed" from being heard on the issue of his citizenship (Br. at 28), but that is incorrect. The immigration judge considered the issue, held a hearing on it, and issued a written decision finding that Guerra Quezada had not shown himself to be a United States citizen. (ROA.112.) Guerra Quezada also could have appealed the immigration judge's removal order (of which the citizenship determination was a subsidiary part) to the Board of Immigration Appeals and, ultimately, to a court of appeals via a petition for review. He also has the ability to challenge USCIS's proposed cancellation of his citizenship certificate administratively and, should that be unsuccessful, in litigation once a final administrative decision on cancellation of the certificate is rendered. There has been no shortage of legal process available to Guerra Quezada, and no violation of due process or any other error is shown by the record here, much less by anecdotal accounts of other allegedly improper removals of different people.

## CONCLUSION

The district court's judgment should be affirmed.

Respectfully submitted,

Nancy E. Larson
Acting United States Attorney

/s/ Brian W. Stoltz
Brian W. Stoltz
Assistant United States Attorney
Texas Bar No. 24060668
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone:  214-659-8626
Facsimile:   214-659-8807
brian.stoltz@usdoj.gov

Attorneys for Appellees

**CERTIFICATE OF SERVICE**

I hereby certify that on September 19, 2025, this document was served on Appellant by transmission through the Court's electronic filing system, and

I further certify that (1) any required privacy redactions have been made; (2) the electronic submission is an exact copy of any paper document; and (3) the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.

/s/ Brian W. Stoltz
Brian W. Stoltz
Assistant United States Attorney

**CERTIFICATE OF COMPLIANCE**

1.      This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 8,033 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Calisto MT font.

/s/ Brian W. Stoltz
Brian W. Stoltz
Assistant United States Attorney

# ADDENDUM

# ADDENDUM TABLE OF CONTENTS

8 U.S.C. § 1401 (1970) ................................................................. A1

8 U.S.C. § 1401 (1976) ................................................................. A4

Pub. L. No. 95-432, 92 Stat. 1046 (1978)* .................................. A7

8 U.S.C. § 1401 (1982) ................................................................. A8

Pub. L. No. 99-658, 100 Stat. 3655 (1986)** ............................. A11

8 U.S.C. § 1401 (1988) .............................................................. A13

\*    Section 3 of Pub. L. No. 95-432 redesignated paragraphs (1) through (7) of INA §301 (i.e., 8 U.S.C. §1401) as paragraphs (a) through (g)

\*\*   Section 12 of Pub. L. No. 99-658 (at 100 Stat. 3657, page A12 herein) changed the ten-year physical-prescence-in-the-United-States requirement to a five-year requirement

# UNITED STATES CODE

## 1970 EDITION

CONTAINING THE GENERAL AND PERMANENT LAWS
OF THE UNITED STATES, IN FORCE
ON JANUARY 20, 1971

Prepared and published under authority of Title 1, U.S. Code, Section 202 (e)
by the Committee on the Judiciary of the House of Representatives



## VOLUME TWO

TITLE 8—ALIENS AND NATIONALITY

TO

TITLE 11—BANKRUPTCY

UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON : 1971

Education, and Welfare by section 5 of 1953 Reorg. Plan No. 1, set out in the Appendix to Title 5, Government Organization and Employees. The Federal Security Agency and the office of Administrator were abolished by section 8 of said 1953 Reorg. Plan No. 1.

CROSS REFERENCES

Definition of the term—
Alien, see section 1101 (a) (3) of this title.
Attorney General, see section 1101 (a) (5) of this title.
Commissoner, see section 1101 (a) (8) of this title.
Entry, see section 1101 (a) (13) of this title.
Service, see section 1101 (a) (34) of this title.
United States, see section 1101 (a) (38) of this title.

§ 1361. Burden of proof upon alien.

Whenever any person makes application for a visa or any other document required for entry, or makes application for admission, or otherwise attempts to enter the United States, the burden of proof shall be upon such person to establish that he is eligible to receive such visa or such document, or is not subject to exclusion under any provision of this chapter, and, if an alien, that he is entitled to the nonimmigrant, quota immigrant, or nonquota immigrant status claimed, as the case may be. If such person fails to establish to the satisfaction of the consular officer that he is eligible to receive a visa or other document required for entry, no visa or other document required for entry shall be issued to such person, nor shall such person be admitted to the United States unless he establishes to the satisfaction of the Attorney General that he is not subject to exclusion under any provision of this chapter. In any deportation proceeding under Part 5 of this subchapter against any person, the burden of proof shall be upon such person to show the time, place, and manner of his entry into the United States, but in presenting such proof he shall be entitled to the production of his visa or other entry document, if any, and of any other documents and records, not considered by the Attorney General to be confidential, pertaining to such entry in the custody of the Service. If such burden of proof is not sustained, such person shall be presumed to be in the United States in violation of law. (June 27, 1952, ch. 477, title II, ch. 9, § 291, 66 Stat. 234.)

CROSS REFERENCES

Definition of the term—
Alien, see section 1101 (a) (3) of this title.
Attorney General, see section 1101 (a) (5) of this title.
Consular officer, see section 1101 (a) (9) of this title.
Entry, see section 1101 (a) (13) of this title.
Nonimmigrant alien, see section 1101 (a) (15) of this title.
Profession, see section 1101(a)(32) of this title.
Service, see section 1101 (a) (34) of this title.
United States, see section 1101 (a) (38) of this title.

§ 1362. Right to counsel.

In any exclusion or deportation proceedings before a special inquiry officer and in any appeal proceedings before the Attorney General from any such exclusion or deportation proceedings, the person concerned shall have the privilege of being represented (at no expense to the Government) by such counsel, authorized to practice in such proceedings, as he shall choose. (June 27, 1952, ch. 477, title II, ch. 9, § 292, 66 Stat. 235.)

CROSS REFERENCES

Definition of the term—
Attorney General, see section 1101 (a) (5) of this title.
Special inquiry officer, see section 1101 (b) (4) of this title.

§ 1363. Deposit of and interest on cash received to secure immigration bonds.

(a) Cash received by the Attorney General as security on an immigration bond shall be deposited in the Treasury of the United States in trust for the obligor on the bond, and shall bear interest payable at a rate determined by the Secretary of the Treasury, except that in no case shall the interest rate exceed 3 per centum per annum. Such interest shall accrue from date of deposit occurring after April 27, 1966, to and including date of withdrawal or date of breach of the immigration bond, whichever occurs first: Provided, That cash received by the Attorney General as security on an immigration bond, and deposited by him in the postal savings system prior to discontinuance of the system, shall accrue interest as provided in this section from the date such cash ceased to accrue interest under the system. Appropriations to the Treasury Department for interest on uninvested funds shall be available for payment of said interest.

(b) The interest accruing on cash received by the Attorney General as security on an immigration bond shall be subject to the same disposition as prescribed for the principal cash, except that interest accruing to the date of breach of the immigration bond shall be paid to the obligor on the bond. (June 27, 1952, ch. 477, title II, ch. 9, § 293, as added July 10, 1970, Pub. L. 91–313, § 2, 84 Stat. 413.)

SUBCHAPTER III.—NATIONALITY AND NATURALIZATION

PART I.—NATIONALITY AT BIRTH AND COLLECTIVE NATURALIZATION

§ 1401. Nationals and citizens of United States at birth.

(a) The following shall be nationals and citizens of the United States at birth:

(1) a person born in the United States, and subject to the jurisdiction thereof;

(2) a person born in the United States to a member of an Indian, Eskimo, Aleutian, or other aboriginal tribe. Provided, That the granting of citizenship under this subsection shall not in any manner impair or otherwise affect the right of such person to tribal or other property;

(3) a person born outside of the United States and its outlying possessions of parents both of whom are citizens of the United States and one of whom has had a residence in the United States or one of its outlying possessions, prior to the birth of such person;

(4) a person born outside of the United States and its outlying possessions of parents one of whom is a citizen of the United States who has been physically present in the United States or one of its outlying possessions for a continuous period of one year prior to the birth of such person, and the other of whom is a national, but not a citizen of the United States;

(5) a person born in an outlying possession of the United States of parents one of whom is a citizen of the United States who has been physically present in the United States or one of its outlying possessions for a continuous period of one year at any time prior to the birth of such person;

(6) a person of unknown parentage found in the United States while under the age of five years, until shown, prior to his attaining the age of twenty-one years, not to have been born in the United States;

(7) a person born outside the geographical limits of the United States and its outlying possessions of parents one of whom is an alien, and the other a citizen of the United States who, prior to the birth of such person, was physically present in the United States or its outlying possessions for a period or periods totaling not less than ten years, at least five of which were after attaining the age of fourteen years; *Provided*, That any periods of honorable service in the Armed Forces of the United States, or periods of employment with the United States Government or with an international organization as that term is defined in section 288 of Title 22 by such citizen parent, or any periods during which such citizen parent is physically present abroad as the dependent unmarried son or daughter and a member of the household of a person (A) honorably serving with the Armed Forces of the United States, or (B) employed by the United States Government or an international organization as defined in section 288 of Title 22, may be included in order to satisfy the physical-presence requirement of this paragraph. This proviso shall be applicable to persons born on or after December 24, 1952, to the same extent as if it had become effective in its present form on that date.

(b) Any person who is a national and citizen of the United States at birth under paragraph (7) of subsection (a) of this section, shall lose his nationality and citizenship unless he shall come to the United States prior to attaining the age of twenty-three years and shall immediately following any such coming be continuously physically present in the United State[1] for at least five years: *Provided*, That such physical presence follows the attainment of the age of fourteen years and precedes the age of twenty-eight years.

(c) Subsection (b) of this section shall apply to a person born abroad subsequent to May 24, 1934: *Provided, however*, That nothing contained in this subsection shall be construed to alter or affect the citizenship of any person born abroad subsequent to May 24, 1934, who, prior to the effective date of this chapter, has taken up a residence in the United States before attaining the age of sixteen years and thereafter, whether before or after the effective date of this chapter, complies or shall comply with the residence requirements for retention of citizenship specified in subsections (g) and (h) of section 201 of the Nationality Act of 1940, as amended.

(June 27, 1952, ch. 477, title III, ch. 1, § 301, 66 Stat. 235; Nov. 6, 1966, Pub. L. 89–770, 80 Stat. 1322.)

REFERENCES IN TEXT

Subsections (g) and (h) of section 201 of the Nationality Act of 1940, as amended, referred to in subsec. (c), were formerly classified to section 601 of this title, and were repealed by section 403 (a) (42) of act June 27, 1952.

AMENDMENTS

1966—Subsec. (a)(7). Pub. L. 89–770 authorized periods of employment with the United States Government or with an international organization by the citizen parent, or any periods during which the citizen parent is physically present abroad as the dependent unmarried son or daughter and a member of the household of a person (A) honorably serving with the Armed Forces of the United States, or (B) employed by the United States Government or an international organization, to be included in order to satisfy the physical presence requirement, and permitted the proviso to be applicable to persons born on or after December 24, 1952.

EFFECTIVE DATE

Chapter effective 180 days after June 27, 1952, see section 407 of act June 27, 1952, set out as a note under section 1101 of this title.

ADMISSION OF ALASKA AS STATE

Alaska Statehood provisions as not conferring, terminating or restoring United States nationality, see section 21 of Pub. L. 85–508, July 7, 1958, 72 Stat. 339, set out as a note preceding section 21 of Title 48, Territories and Insular Possessions.

CROSS REFERENCES

Definition of the term—
    Alien, see section 1101 (a) (3) of this title.
    National of the United States, see section 1101 (a) (22) of this title.
    Parent, as used in subchapters I and II of this chapter, see section 1101(b)(2) of this title.
    Parent, as used in this subchapter, see section 1101 (c) (2) of this title.
    Residence, see section 1101 (a) (33) of this title.
    United States, see section 1101 (a) (38) of this title.
Persons born and naturalized in United States and subject to its jurisdiction as citizens of United States and State wherein they reside, see Const. Amend. 14, § 1.

SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in sections 1401a, 1401b, 1408, 1409, 1452 of this title; title 26 sections 877, 2107, 2501.

§ 1401a. Birth abroad before 1952 to service parent.

Section 1401 (a) (7) of this title shall be considered to have been and to be applicable to a child born outside of the United States and its outlying possessions after January 12, 1941, and before December 24, 1952, of parents one of whom is a citizen of the United States who has served in the Armed Forces of the United States after December 31, 1946, and before December 24, 1952, and whose case does not come within the provisions of section 201 (g) or (i) of the Nationality Act of 1940. (Mar. 16, 1956, ch. 85, 70 Stat. 50.)

REFERENCES IN TEXT

Section 201 (g) and (i), referred to in the text, which were repealed by act June 27, 1952, ch. 477, title IV, § 403 (a) (42), 66 Stat. 280, eff. Dec. 24, 1952, provided as follows:
"The following shall be nationals and citizens of the United States at birth:

*        *        *        *        *

"(g) A person born outside the United States and its outlying possessions of parents one of whom is a citizen of the United States who, prior to the birth of such person, has had ten years' residence in the United States or one of its outlying possessions, at least five of which were after

---

[1] So in original. Probably should read "United States".

# UNITED STATES CODE

## 1976 EDITION

CONTAINING THE GENERAL AND PERMANENT LAWS
OF THE UNITED STATES, IN FORCE
ON JANUARY 3, 1977

Prepared and published under authority of Title 2, U.S. Code, Section 285b
by the Office of the Law Revision Counsel of the House of Representatives



### VOLUME TWO

TITLE 8—ALIENS AND NATIONALITY
TO
TITLE 11—BANKRUPTCY

UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON : 1977

CROSS REFERENCES

Definition of attorney general and special inquiry officer, see section 1101 of this title.

§ 1363. Deposit of and interest on cash received to secure immigration bonds

(a) Cash received by the Attorney General as security on an immigration bond shall be deposited in the Treasury of the United States in trust for the obligor on the bond, and shall bear interest payable at a rate determined by the Secretary of the Treasury, except that in no case shall the interest rate exceed 3 per centum per annum. Such interest shall accrue from date of deposit occurring after April 27, 1966, to and including date of withdrawal or date of breach of the immigration bond, whichever occurs first: *Provided,* That cash received by the Attorney General as security on an immigration bond, and deposited by him in the postal savings system prior to discontinuance of the system, shall accrue interest as provided in this section from the date such cash ceased to accrue interest under the system. Appropriations to the Treasury Department for interest on uninvested funds shall be available for payment of said interest.

(b) The interest accruing on cash received by the Attorney General as security on an immigration bond shall be subject to the same disposition as prescribed for the principal cash, except that interest accruing to the date of breach of the immigration bond shall be paid to the obligor on the bond.

(June 27, 1952, ch. 477, title II, ch. 9, § 293, as added July 10, 1970, Pub. L. 91–313, § 2, 84 Stat. 413.)

SUBCHAPTER III—NATIONALITY AND NATURALIZATION

SUBCHAPTER REFERRED TO IN OTHER SECTIONS

This subchapter is referred to in sections 1101, 1438 of this title.

PART I—NATIONALITY AT BIRTH AND COLLECTIVE NATURALIZATION

§ 1401. Nationals and citizens of United States at birth

(a) The following shall be nationals and citizens of the United States at birth:

(1) a person born in the United States, and subject to the jurisdiction thereof;

(2) a person born in the United States to a member of an Indian, Eskimo, Aleutian, or other aboriginal tribe: *Provided,* That the granting of citizenship under this subsection shall not in any manner impair or otherwise affect the right of such person to tribal or other property;

(3) a person born outside of the United States and its outlying possessions of parents both of whom are citizens of the United States and one of whom has had a residence in the United States or one of its outlying possessions, prior to the birth of such person;

(4) a person born outside of the United States and its outlying possessions of parents one of whom is a citizen of the United States who has been physically present in the United States or one of its outlying posses-

sions for a continuous period of one year prior to the birth of such person, and the other of whom is a national, but not a citizen of the United States;

(5) a person born in an outlying possession of the United States of parents one of whom is a citizen of the United States who has been physically present in the United States or one of its outlying possessions for a continuous period of one year at any time prior to the birth of such person;

(6) a person of unknown parentage found in the United States while under the age of five years, until shown, prior to his attaining the age of twenty-one years, not to have been born in the United States;

(7) a person born outside the geographical limits of the United States and its outlying possessions of parents one of whom is an alien, and the other a citizen of the United States who, prior to the birth of such person, was physically present in the United States or its outlying possessions for a period or periods totaling not less than ten years, at least five of which were after attaining the age of fourteen years: *Provided,* That any periods of honorable service in the Armed Forces of the United States, or periods of employment with the United States Government or with an international organization as that term is defined in section 288 of title 22 by such citizen parent, or any periods during which such citizen parent is physically present abroad as the dependent unmarried son or daughter and a member of the household of a person (A) honorably serving with the Armed Forces of the United States, or (B) employed by the United States Government or an international organization as defined in section 288 of title 22, may be included in order to satisfy the physical-presence requirement of this paragraph. This proviso shall be applicable to persons born on or after December 24, 1952, to the same extent as if it had become effective in its present form on that date.

(b) Any person who is a national and citizen of the United States under paragraph (7) of subsection (a) of this section shall lose his nationality and citizenship unless—(1) he shall come to the United States and be continuously physically present therein for a period of not less than two years between the ages of fourteen years and twenty-eight years; or (2) the alien parent is naturalized while the child is under the age of eighteen years and the child begins to reside permanently in the United States while under the age of eighteen years. In the administration of this subsection absences from the United States of less than sixty days in the aggregate during the period for which continuous physical presence in the United States is required shall not break the continuity of such physical presence.

(c) Subsection (b) of this section shall apply to a person born abroad subsequent to May 24, 1934: *Provided, however,* That nothing contained in this subsection shall be construed to alter or affect the citizenship of any person born abroad subsequent to May 24, 1934, who, prior to the effective date of this chapter, has taken up a residence in the United States before attaining the age of sixteen years and

thereafter, whether before or after the effective date of this chapter, complies or shall comply with the residence requirements for retention of citizenship specified in subsections (g) and (h) of section 201 of the Nationality Act of 1940, as amended.

(d) Nothing contained in subsection (b) of this section, as amended, shall be construed to alter or affect the citizenship of any person who has come to the United States prior to October 27, 1972, and who, whether before or after October 27, 1972, immediately following such coming complies or shall comply with the physical presence requirements for retention of citizenship in subsection (b) of this section prior to October 27, 1972, and the repeal of section 1401b of this title.

(June 27, 1952, ch. 477, title III, ch. 1, § 301, 66 Stat. 235; Nov. 6, 1966, Pub. L. 89–770, 80 Stat. 1322; Oct. 27, 1972, Pub. L. 92–584, §§ 1, 3, 86 Stat. 1289.)

### References in Text

Subsections (g) and (h) of section 201 of the Nationality Act of 1940, as amended, referred to in subsec. (c), were formerly classified to section 601 of this title, and were repealed by section 403(a)(42) of act June 27, 1952.

Section 1401b of this title, referred to in subsec. (d), was repealed by Pub. L. 92–584, § 2, Oct. 27, 1972, 86 Stat. 1289, and is now covered by subsec. (b) of this section.

### Amendments

1972—Subsec. (b). Pub. L. 92–584, § 1, substituted provisions that nationals and citizens of the United States under subsec. (a)(7), lose such status unless they are present continuously in the United States for two years between the ages of fourteen and twenty eight years, or the alien parent is naturalized while the child is under the age of eighteen years, and the child begins to reside permanently in the United States while under the age of eighteen years, and that absence from the United States of less than sixty days will not break the continuity of presence, for provisions that such status would be lost unless the nationals and citizens come to the United States prior to attaining twenty three years and be present continuously in the United States for five years, and that such presence should be between the age of fourteen and twenty eight years.

Subsec. (d). Pub. L. 92–584, § 3, added subsec. (d).

1966—Subsec. (a)(7). Pub. L. 89–770 authorized periods of employment with the United States Government or with an international organization by the citizen parent, or any periods during which the citizen parent is physically present abroad as the dependent unmarried son or daughter and a member of the household of a person (A) honorably serving with the Armed Forces of the United States, or (B) employed by the United States Government or an international organization, to be included in order to satisfy the physical presence requirement, and permitted the proviso to be applicable to persons born on or after December 24, 1952.

### Effective Date

Chapter effective 180 days after June 27, 1952, see section 407 of act June 27, 1952, set out as a note under section 1101 of this title.

### Admission of Alaska as State

Alaska Statehood provisions as not conferring, terminating or restoring United States nationality, see section 21 of Pub. L. 85–508, July 7, 1958, 72 Stat. 339, set out as a note preceding former section 21 of Title 48, Territories and Insular Possessions.

### Cross References

Definition of the term—
  Alien, see section 1101(a)(3) of this title.
  National of the United States, see section 1101(a)(22) of this title.
  Parent, as used in subchapters I and II of this chapter, see section 1101(b)(2) of this title.
  Parent, as used in this subchapter, see section 1101(c)(2) of this title.
  Residence, see section 1101(a)(33) of this title.
  United States, see section 1101(a)(38) of this title.

Persons born and naturalized in United States and subject to its jurisdiction as citizens of United States and State wherein they reside, see Const. Amend. 14, § 1.

### Section Referred to in Other Sections

This section is referred to in sections 1401a, 1408, 1409, 1452 of this title; title 26 sections 877, 2107, 2501.

### § 1401a. Birth abroad before 1952 to service parent

Section 1401(a)(7) of this title shall be considered to have been and to be applicable to a child born outside of the United States and its outlying possessions after January 12, 1941, and before December 24, 1952, of parents one of whom is a citizen of the United States who has served in the Armed Forces of the United States after December 31, 1946, and before December 24, 1952, and whose case does not come within the provisions of section 201(g) or (i) of the Nationality Act of 1940.

(Mar. 16, 1956, ch. 85, 70 Stat. 50.)

### References in Text

Section 201(g) and (i) of the Nationality Act of 1940, referred to in the text, which were repealed by act June 27, 1952, ch. 477, title IV, § 403(a)(42), 66 Stat. 280, eff. Dec. 24, 1952, provided as follows:

"The following shall be nationals and citizens of the United States at birth:

\*      \*      \*      \*      \*

"(g) A person born outside the United States and its outlying possessions of parents one of whom is a citizen of the United States who, prior to the birth of such person, has had ten years' residence in the United States or one of its outlying possessions, at least five of which were after attaining the age of sixteen years, the other being an alien: *Provided*, That, in order to retain such citizenship, the child must reside in the United States or its outlying possessions for a period or periods totaling five years between the ages of thirteen and twenty-one years: *Provided further*, That, if the child has not taken up a residence in the United States or its outlying possessions by the time he reaches the age of sixteen years, or if he resides abroad for such a time that it becomes impossible for him to complete the five years' residence in the United States or its outlying possessions before reaching the age of twenty-one years, his American citizenship shall thereupon cease.

"The preceding provisos shall not apply to a child born abroad whose American parent is at the time of the child's birth residing abroad solely or principally in the employment of the Government of the United States or a bona fide American, educational, scientific, philanthropic, religious, commercial, or financial organization, having its principal office or place of business in the United States, or an international agency of an official character in which the United States participates, for which he receives a substantial compensation:

\*      \*      \*      \*      \*

"(i) A person born outside the United States and its outlying possessions of parents one of whom is a citi-

92 STAT. 1046          PUBLIC LAW 95–432—OCT. 10, 1978

## Public Law 95–432
## 95th Congress

### An Act

Oct. 10, 1978
[H.R. 13349]

To repeal certain sections of title III of the Immigration and Nationality Act, and for other purposes.

Immigration and
Nationality Act,
amendment.
Repeals.
8 USC 1401,
1482.
8 USC 1481,
1484–1487.
8 USC 1401.

8 USC 1481.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That subsections (b), (c), and (d) of section 301 and section 350 of the Immigration and Nationality Act are hereby repealed, effective as of the date of enactment of this Act.

Sec. 2. Paragraphs (5) and (8) of section 349 and sections 352, 353, 354, and 355 of the Immigration and Nationality Act are hereby repealed.

Sec. 3. Section 301 of the Immigration and Nationality Act is amended by striking out "(a)" after "Sec. 301.", and by redesignating paragraphs (1) through (7) as subsections (a) through (g), respectively.

Sec. 4. Section 349 of the Immigration and Nationality Act is amended by inserting "(a)" after "Sec. 349.", and by renumbering paragraphs (6), (7), and (9) as paragraphs (5), (6), and (7), respectively.

Approved October 10, 1978.

---

LEGISLATIVE HISTORY:

HOUSE REPORT No. 95–1493 (Comm. on the Judiciary).
CONGRESSIONAL RECORD, Vol. 124 (1978):
    Sept. 19, considered and passed House.
    Sept. 28, considered and passed Senate.



AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

# UNITED STATES CODE

## 1982 EDITION

### CONTAINING THE GENERAL AND PERMANENT LAWS
### OF THE UNITED STATES, IN FORCE
### ON JANUARY 14, 1983

Prepared and published under authority of Title 2, U.S. Code, Section 285b
by the Office of the Law Revision Counsel of the House of Representatives

## VOLUME TWO

### TITLE 7—AGRICULTURE

TO

### TITLE 9—ARBITRATION

UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON : 1983

CROSS REFERENCES

Definition of the term—
Alien, see section 1101(a)(3) of this title.
Attorney General, see section 1101(a)(5) of this title.
Consular officer, see section 1101(a)(9) of this title.
Entry, see section 1101(a)(13) of this title.
Nonimmigrant alien, see section 1101(a)(15) of this title.
Profession, see section 1101(a)(32) of this title.
Service, see section 1101(a)(34) of this title.
United States, see section 1101(a)(38) of this title.

§ 1362. Right to counsel

In any exclusion or deportation proceedings before a special inquiry officer and in any appeal proceedings before the Attorney General from any such exclusion or deportation proceedings, the person concerned shall have the privilege of being represented (at no expense to the Government) by such counsel, authorized to practice in such proceedings, as he shall choose.

(June 27, 1952, ch. 477, title II, ch. 9, § 292, 66 Stat. 235.)

CROSS REFERENCES

Definition of attorney general and special inquiry officer, see section 1101 of this title.

§ 1363. Deposit of and interest on cash received to secure immigration bonds

(a) Cash received by the Attorney General as security on an immigration bond shall be deposited in the Treasury of the United States in trust for the obligor on the bond, and shall bear interest payable at a rate determined by the Secretary of the Treasury, except that in no case shall the interest rate exceed 3 per centum per annum. Such interest shall accrue from date of deposit occurring after April 27, 1966, to and including date of withdrawal or date of breach of the immigration bond, whichever occurs first: *Provided*, That cash received by the Attorney General as security on an immigration bond, and deposited by him in the postal savings system prior to discontinuance of the system, shall accrue interest as provided in this section from the date such cash ceased to accrue interest under the system. Appropriations to the Treasury Department for interest on uninvested funds shall be available for payment of said interest.

(b) The interest accruing on cash received by the Attorney General as security on an immigration bond shall be subject to the same disposition as prescribed for the principal cash, except that interest accruing to the date of breach of the immigration bond shall be paid to the obligor on the bond.

(June 27, 1952, ch. 477, title II, ch. 9, § 293, as added July 10, 1970, Pub. L. 91–313, § 2, 84 Stat. 413.)

SUBCHAPTER III—NATIONALITY AND NATURALIZATION

SUBCHAPTER REFERRED TO IN OTHER SECTIONS

This subchapter is referred to in sections 1101, 1438 of this title.

PART I—NATIONALITY AT BIRTH AND COLLECTIVE NATURALIZATION

§ 1401. Nationals and citizens of United States at birth

The following shall be nationals and citizens of the United States at birth:

(a) a person born in the United States, and subject to the jurisdiction thereof;

(b) a person born in the United States to a member of an Indian, Eskimo, Aleutian, or other aboriginal tribe: *Provided*, That the granting of citizenship under this subsection shall not in any manner impair or otherwise affect the right of such person to tribal or other property;

(c) a person born outside of the United States and its outlying possessions of parents both of whom are citizens of the United States and one of whom has had a residence in the United States or one of its outlying possessions, prior to the birth of such person;

(d) a person born outside of the United States and its outlying possessions of parents one of whom is a citizen of the United States who has been physically present in the United States or one of its outlying possessions for a continuous period of one year prior to the birth of such person, and the other of whom is a national, but not a citizen of the United States;

(e) a person born in an outlying possession of the United States of parents one of whom is a citizen of the United States who has been physically present in the United States or one of its outlying possessions for a continuous period of one year at any time prior to the birth of such person;

(f) a person of unknown parentage found in the United States while under the age of five years, until shown, prior to his attaining the age of twenty-one years, not to have been born in the United States;

(g) a person born outside the geographical limits of the United States and its outlying possessions of parents one of whom is an alien, and the other a citizen of the United States who, prior to the birth of such person, was physically present in the United States or its outlying possessions for a period or periods totaling not less than ten years, at least five of which were after attaining the age of fourteen years: *Provided*, That any periods of honorable service in the Armed Forces of the United States, or periods of employment with the United States Government or with an international organization as that term is defined in section 288 of title 22 by such citizen parent, or any periods during which such citizen parent is physically present abroad as the dependent unmarried son or daughter and a member of the household of a person (A) honorably serving with the Armed Forces of the United States, or (B) employed by the United States Government or an international organization as defined in section 288 of title 22, may be included in order to satisfy the physical-presence requirement of this paragraph. This proviso shall be applicable to persons born on or after December 24, 1952,

to the same extent as if it had become effective in its present form on that date.

(June 27, 1952, ch. 477, title III, ch. 1, § 301, 66 Stat. 235; Nov. 6, 1966, Pub. L. 89–770, 80 Stat. 1322; Oct. 27, 1972, Pub. L. 92–584, §§ 1, 3, 86 Stat. 1289; Oct. 10, 1978, Pub. L. 95–432, §§ 1, 3, 92 Stat. 1046.)

#### AMENDMENTS

1978—Subsec. (a). Pub. L. 95–432, § 3, struck out "(a)" preceding "The following" and redesignated pars. (1) to (7) as (a) to (g), respectively.

Subsec. (b). Pub. L. 95–432, § 1, struck out subsec. (b) which provided that any person who was a national or citizen of the United States under subsec. (a)(7) lose his nationality or citizenship unless he be continuously physically present in the United States for a period of not less than two years between the ages of 14 and 28 or that the alien parent be naturalized while the child was under 18 years of age and the child began permanent residence in the United States while under 18 years of age and that absence from the United States of less than 60 days not break the continuity of presence.

Subsec. (c). Pub. L. 95–432, § 1, struck out subsec. (c) which provided that former subsec. (b) apply to persons born abroad subsequent to May 24, 1934, except that this not be construed to alter the citizenship of any person born abroad subsequent to May 24, 1934 who, prior to the effective date of this chapter, had taken up residence in the United States before attaining 16 years of age, and thereafter, whether before or after the effective date of this chapter, complied with the residence requirements of section 201(g) and (h) of the Nationality Act of 1940.

Subsec. (d). Pub. L. 95–432, § 1, struck out subsec. (d) which provided that nothing in former subsec. (b) be construed to alter the citizenship of any person who came into the United States prior to Oct. 27, 1972, and who, whether before or after Oct. 27, 1972, immediately following such coming complied with the physical presence requirements for retention of citizenship specified in former subsec. (b), prior to amendment of former subsec. (b) by Pub. L. 92–584.

1972—Subsec. (b). Pub. L. 92–584, § 1, substituted provisions that nationals and citizens of the United States under subsec. (a)(7), lose such status unless they are present continuously in the United States for two years between the ages of fourteen and twenty eight years, or the alien parent is naturalized while the child is under the age of eighteen years and the child begins to reside permanently in the United States while under the age of eighteen years, and that absence from the United States of less than sixty days will not break the continuity of presence, for provisions that such status would be lost unless the nationals and citizens come to the United States prior to attaining twenty three years and be present continuously in the United States for five years, and that such presence should be between the age of fourteen and twenty eight years.

Subsec. (d). Pub. L. 92–584, § 3, added subsec. (d).

1966—Subsec. (a)(7). Pub. L. 89–770 authorized periods of employment with the United States Government or with an international organization by the citizen parent, or any periods during which the citizen parent is physically present abroad as the dependent unmarried son or daughter and a member of the household of a person (A) honorably serving with the Armed Forces of the United States, or (B) employed by the United States Government or an international organization, to be included in order to satisfy the physical presence requirement, and permitted the proviso to be applicable to persons born on or after December 24, 1952.

#### EFFECTIVE DATE OF 1978 AMENDMENT

Section 1 of Pub. L. 95–432 provided in part that repeal of subsecs. (b) to (d) of this section and of section 1482 of this title is effective Oct. 10, 1978.

#### EFFECTIVE DATE

Chapter effective 180 days after June 27, 1952, see section 407 of act June 27, 1952, set out as a note under section 1101 of this title.

#### ADMISSION OF ALASKA AS STATE

Alaska Statehood provisions as not conferring, terminating or restoring United States nationality, see section 21 of Pub. L. 85–508, July 7, 1958, 72 Stat. 339, set out as a note preceding former section 21 of Title 48, Territories and Insular Possessions.

#### CROSS REFERENCES

Definition of the term—
Alien, see section 1101(a)(3) of this title.
National of the United States, see section 1101(a)(22) of this title.
Parent, as used in subchapters I and II of this chapter, see section 1101(b)(2) of this title.
Parent, as used in this subchapter, see section 1101(c)(2) of this title.
Residence, see section 1101(a)(33) of this title.
United States, see section 1101(a)(38) of this title.
Persons born and naturalized in United States and subject to its jurisdiction as citizens of United States and State wherein they reside, see Const. Amend. 14, § 1.

#### SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in sections 1401a, 1408, 1409, 1452 of this title; title 26 sections 877, 2107, 2501.

### § 1401a. Birth abroad before 1952 to service parent

Section 1401(g) of this title shall be considered to have been and to be applicable to a child born outside of the United States and its outlying possessions after January 12, 1941, and before December 24, 1952, of parents one of whom is a citizen of the United States who has served in the Armed Forces of the United States after December 31, 1946, and before December 24, 1952, and whose case does not come within the provisions of section 201(g) or (i) of the Nationality Act of 1940.

(Mar. 16, 1956, ch. 85, 70 Stat. 50; Dec. 29, 1981, Pub. L. 97–116, § 18(u)(2), 95 Stat. 1621.)

#### REFERENCES IN TEXT

Section 201(g) and (i) of the Nationality Act of 1940, referred to in text, which were repealed by act June 27, 1952, ch. 477, title IV, § 403(a)(42), 66 Stat. 280, eff. Dec. 24, 1952, provided as follows:
"The following shall be nationals and citizens of the United States at birth:

\*     \*     \*     \*     \*

"(g) A person born outside the United States and its outlying possessions of parents one of whom is a citizen of the United States who, prior to the birth of such person, has had ten years' residence in the United States or one of its outlying possessions, at least five of which were after attaining the age of sixteen years, the other being an alien: *Provided*, That, in order to retain such citizenship, the child must reside in the United States or its outlying possessions for a period or periods totaling five years between the ages of thirteen and twenty-one years: *Provided further*, That, if the child has not taken up a residence in the United States or its outlying possessions by the

**Public Law 99–653**
**99th Congress**

## An Act

To amend the Immigration and Nationality Act, and for other purposes.

Nov. 14, 1986
[H.R. 4444]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That this Act may be cited as the "Immigration and Nationality Act Amendments of 1986".

Immigration and Nationality Act Amendments of 1986.
8 USC 1101 note.

SEC. 2. Section 101(b)(1)(E) (8 U.S.C. 1101(b)(1)(E)) is amended to read:

"(E) a child adopted while under the age of sixteen years if the child has been in the legal custody of, and has resided with, the adopting parent or parents for at least two years: *Provided,* That no natural parent of any such adopted child shall thereafter, by virtue of such parentage, be accorded any right, privilege, or status under this Act; or".

Children and youth.

SEC. 3. Section 101 (8 U.S.C. 1101) is amended by striking out paragraph (1) of subsection (c).

SEC. 4. Section 202(b) (8 U.S.C. 1152(b)) is amended to read:

"(b) Each independent country, self-governing dominion, mandated territory, and territory under the international trusteeship system of the United Nations, other than the United States and its outlying possessions, shall be treated as a separate foreign state for the purposes of the numerical limitation set forth in the proviso to subsection (a) of this section when approved by the Secretary of State. All other inhabited lands shall be attributed to a foreign state specified by the Secretary of State. For the purposes of this Act the foreign state to which an immigrant is chargeable shall be determined by birth within such foreign state except that (1) an alien child, when accompanied by or following to join his alien parent or parents, may be charged to the foreign state of either parent if such parent has received or would be qualified for an immigrant visa, if necessary to prevent the separation of the child from the parent or parents, and if immigration charged to the foreign state to which such parent has been or would be chargeable has not reached the numerical limitation set forth in the proviso to subsection (a) of this section for that fiscal year; (2) if an alien is chargeable to a different foreign state from that of his spouse, the foreign state to which such alien is chargeable may, if necessary to prevent the separation of husband and wife, be determined by the foreign state of the spouse he is accompanying or following to join, if such spouse has received or would be qualified for an immigrant visa and if immigration charged to the foreign state to which such spouse has been or would be chargeable has not reached the numerical limitation set forth in the proviso to subsection (a) of this section for that fiscal year; (3) an alien born in the United States shall be considered as having been born in the country of which he is a citizen or subject, or, if he is not a citizen or subject of any country, in the last foreign country in which he had his residence as determined by the consular officer; (4) an alien born within any foreign state in which neither of his

United Nations.
Foreign states.

Children and youth.



permanently attached to the application and become a part thereof.".

(b) amending the first two sentences of subsection (e) thereof to read:

"(e) Except as may be otherwise prescribed by regulations, each application required by this section shall be signed by the applicant in the presence of the consular officer, and verified by the oath of the applicant administered by the consular officer. The application for an immigrant visa, when visaed by the consular officer, shall become the immigrant visa.".

SEC. 7. (a) Section 212(a) (8 U.S.C. 1182(a)) is amended by: repealing paragraph (24) thereof: *Provided,* That no paragraph following paragraph (24) shall be redesignated as a result of this amendment.

(b) Section 238 (8 U.S.C. 1228) is amended by repealing subsection (a) thereof and by redesignating subsections (b), (c), (d), and (e) as subsections (a), (b), (c), and (d) respectively.

(c) Section 241(a) (8 U.S.C. 1251(a)) is amended by repealing paragraph (10) thereof: *Provided,* That no paragraph following paragraph (10) shall be redesignated as a result of this amendment.

SEC. 8. Section 261 (8 U.S.C. 1301) is amended to read: "No visa shall be issued to any alien seeking to enter the United States until such alien has been registered in accordance with section 221(b).".

SEC. 9. Subsection (a) of section 262 (8 U.S.C. 1302) is amended by deleting the words "section 221(b) of this Act or".

SEC. 10. The first sentence of section 264(a) (8 U.S.C. 1304) is amended to read:

"(a) The Attorney General and the Secretary of State jointly are authorized and directed to prepare forms for the registration of aliens under section 261 of this title, and the Attorney General is authorized and directed to prepare forms for the registration and fingerprinting of aliens under section 262 of this title.".

SEC. 11. Sections (1) and (2) of the Act of October 24, 1962 (76 Stat. 1247, Public Law 87–885) and section 25(a) of the Act of September 26, 1961 (75 Stat. 650, Public Law 87–301) are repealed.

8 USC 1153 notes.

SEC. 12. Section 301(g) (8 U.S.C. 1401(g)) is amended by striking out "ten years, at least five" and inserting in lieu thereof "five years, at least two".

SEC. 13. Subsection (a) of section 309 (8 U.S.C. 1409) is amended—

(a) by striking out "paragraphs (3), (4), (5), and (7) of section 301(a)" and inserting in lieu thereof "paragraphs (c), (d), (e), and (g) of section 301"; and

(b) by striking out all after "wedlock", and inserting in lieu thereof "if a blood relationship between the child and the father is established by clear and convincing evidence, provided the father had the nationality of the United States at the time of the child's birth, the father unless deceased has agreed in writing to provide financial support for the child until such child reaches the age of eighteen years and if, while such child is under the age of eighteen years, (1) such child is legitimated under the law of the child's residence or domicile, or (2) the father acknowledges paternity of the child in writing under oath, or (3) paternity of the child is established by adjudication of a competent court.".

Children and youth.

SEC. 14. Section 320(a) (8 U.S.C. 1431(a)) is amended by inserting "unmarried and" after "(1) such naturalization takes place while such child is".

# UNITED STATES CODE

## 1988 EDITION

### CONTAINING THE GENERAL AND PERMANENT LAWS
### OF THE UNITED STATES, IN FORCE
### ON JANUARY 3, 1989

Prepared and published under authority of Title 2, U.S. Code, Section 285b,
by the Office of the Law Revision Counsel of the House of Representatives



## VOLUME TWO

### TITLE 7—AGRICULTURE

TO

### TITLE 9—ARBITRATION

UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON : 1989

## SUBCHAPTER III—NATIONALITY AND NATURALIZATION

### SUBCHAPTER REFERRED TO IN OTHER SECTIONS

This subchapter is referred to in sections 1101, 1161, 1186a, 1255a, 1438 of this title.

### PART I—NATIONALITY AT BIRTH AND COLLECTIVE NATURALIZATION

### § 1401. Nationals and citizens of United States at birth

The following shall be nationals and citizens of the United States at birth:

(a) a person born in the United States, and subject to the jurisdiction thereof;

(b) a person born in the United States to a member of an Indian, Eskimo, Aleutian, or other aboriginal tribe: *Provided,* That the granting of citizenship under this subsection shall not in any manner impair or otherwise affect the right of such person to tribal or other property;

(c) a person born outside of the United States and its outlying possessions of parents both of whom are citizens of the United States and one of whom has had a residence in the United States or one of its outlying possessions, prior to the birth of such person;

(d) a person born outside of the United States and its outlying possessions of parents one of whom is a citizen of the United States who has been physically present in the United States or one of its outlying possessions for a continuous period of one year prior to the birth of such person, and the other of whom is a national, but not a citizen of the United States;

(e) a person born in an outlying possession of the United States of parents one of whom is a citizen of the United States who has been physically present in the United States or one of its outlying possessions for a continuous period of one year at any time prior to the birth of such person;

(f) a person of unknown parentage found in the United States while under the age of five years, until shown, prior to his attaining the age of twenty-one years, not to have been born in the United States;

(g) a person born outside the geographical limits of the United States and its outlying possessions of parents one of whom is an alien, and the other a citizen of the United States who, prior to the birth of such person, was physically present in the United States or its outlying possessions for a period or periods totaling not less than five years, at least two of which were after attaining the age of fourteen years: *Provided,* That any periods of honorable service in the Armed Forces of the United States, or periods of employment with the United States Government or with an international organization as that term is defined in section 288 of title 22 by such citizen parent, or any periods during which such citizen parent is physically present abroad as the dependent unmarried son or daughter and a member of the household of a person (A) honorably serving with the Armed Forces of the United States, or (B) employed by the

United States Government or an international organization as defined in section 288 of title 22, may be included in order to satisfy the physical-presence requirement of this paragraph. This proviso shall be applicable to persons born on or after December 24, 1952, to the same extent as if it had become effective in its present form on that date.

(June 27, 1952, ch. 477, title III, ch. 1, § 301, 66 Stat. 235; Nov. 6, 1966, Pub. L. 89–770, 80 Stat. 1322; Oct. 27, 1972, Pub. L. 92–584, §§ 1, 3, 86 Stat. 1289; Oct. 10, 1978, Pub. L. 95–432, §§ 1, 3, 92 Stat. 1046; Nov. 14, 1986, Pub. L. 99–653, § 12, 100 Stat. 3657.)

### AMENDMENTS

1986—Subsec. (g). Pub. L. 99–653 substituted "five years, at least two" for "ten years, at least five".

1978—Subsec. (a). Pub. L. 95–432, § 3, struck out "(a)" before "The following" and redesignated pars. (1) to (7) as (a) to (g), respectively.

Subsec. (b). Pub. L. 95–432, § 1, struck out subsec. (b) which provided that any person who was a national or citizen of the United States under subsec. (a)(7) lose his nationality or citizenship unless he be continuously physically present in the United States for a period of not less than two years between the ages of 14 and 26 or that the alien parent be naturalized while the child was under 18 years of age and the child began permanent residence in the United States while under 18 years of age and that absence from the United States of less than 60 days not break the continuity of presence.

Subsec. (c). Pub. L. 95–432, § 1, struck out subsec. (c) which provided that former subsec. (h) apply to persons born abroad subsequent to May 24, 1934, except that this not be construed to alter the citizenship of any person born abroad subsequent to May 24, 1934 who, prior to the effective date of this chapter, had taken up residence in the United States before attaining 16 years of age, and thereafter, whether before or after the effective date of this chapter, complied with the residence requirements of section 201(g) and (h) of the Nationality Act of 1940.

Subsec. (d). Pub. L. 95–432, § 1, struck out subsec. (d) which provided that nothing in former subsec. (b) be construed to alter the citizenship of any person who came into the United States prior to Oct. 27, 1972, and who, whether before or after Oct. 27, 1972, immediately following such coming complied with the physical presence requirements for retention of citizenship specified in former subsec. (b), prior to amendment of former subsec. (b) by Pub. L. 92–584.

1972—Subsec. (b). Pub. L. 92–584, § 1, substituted provisions that nationals and citizens of the United States under subsec. (a)(7), lose such status unless they are present continuously in the United States for two years between the ages of fourteen and twenty eight years, or the alien parent is naturalized while the child is under the age of eighteen years and the child begins to reside permanently in the United States while under the age of eighteen years, and that absence from the United States of less than sixty days will not break the continuity of presence, for provisions that such status would be lost unless the nationals and citizens come to the United States prior to attaining twenty three years and be present continuously in the United States for five years, and that such presence should be between the age of fourteen and twenty eight years.

Subsec. (d). Pub. L. 92–584, § 3, added subsec. (d).

1966—Subsec. (a)(7). Pub. L. 89–770 authorized periods of employment with the United States Government or with an international organization by the citizen parent, or any periods during which the citizen parent is physically present abroad as the dependent